Judge Marshall
delivered the Opinion of the Court.
Vicaro was indicted, in the Louisville City Court, for suffering “unlawful games at Poker, Brag, Whist, Faro,” &c. &c. in a house of which he was superintendent, in the City of Louisville, “ at which unlawful games, money, bank bills, and property, were lost and won.” Upon his plea of not guilty, a verdict and judgment were rendered against him for two hundred dollars. To reverse which, he prosecutes a writ of error.
Various objections were taken to the proceedings in the Court below, and several questions are presented, by the assignment of errors, for the decision of this Court. Some of these have been already settled, in the case of Tesh vs. The Commonwealth, 4 Dana, 522; and of the others, three only need be stated in this opinion.
First. The proceeding is intended to be under the tenth section of the statute of 1833, to amend the several acts against unlawful gaming (1 Stat. Law, 760-61;) and if the judgment is not authorized by that section, it cannot be sustained. It is by that section enacted, among other things, that any owner, tenant, or other *505 superintendent of a house, &c. “ who shall permit or suffer games at faro, or any other unlawful game or games whatever, at which money, or any other thing, is won or lost in such house, &c. shall, for every such offence, forfeit and pay, at the discretion of a jury, any sum not less than two hundred dollars, and not more than five hundred dollars.”
The Court instructed the jury, in substance, that, if the defendant had suffered games of poker in a house of which he was the superintendent, at which games, money was won and lost, they should find against him, in a sum “not less than two hundred dollars, nor more than five hundred dollars.” And the question made, is whether, as the game of “poker” is not specially named in this act, or in any other, as an “unlawful” game, and no penalty is any where particularly denounced against it, or against those by whom it may be played, the suffering of that game in a house of which the defendant was superintendent, is an offence within this act, though money were lost and won upon it. In other words, does the act, in describing this offence, mean to refer to any other criterion of the illegality of a game, but the fact that money, or other thing, was lost and won at it.
We are of opinion, that no other criterion was intended to be referred to by this clause of the act. Every game at which money or property is won and lost, is unlawful. Every such game, is not only contrary to good morals, and therefore to the general policy and objects of the law, but is, in some way or other, directly or indirectly, prohibited by legislative enactments, and is therefore, in a stricter sense, unlawful. It is the winning and losing, that is, the betting, which constitutes the real evil against which the Legislature has directed its efforts. Betting is unlawful, whatever may be the occasion, and the money, or thing staked for the bet, is forfeited. (1 Stat. Law, 755, &c.) And surely that which is principally, if not solely, intended to be an occasion for betting, which has no useful purpose, and which is actually made the occasion of winning and losing money or other thing, cannot be otherwise than *506 unlawful. Such is every game, properly so called, at which money &c. is won and lost.
Review of various acts of assembly—showing that all manner of games at which money or property is lost and won, and all betting, are prohibited by them.
A distinction, it is true, has been made, in our legislation, in regard to different classes of games; but this distinction has generally been made, rather with respect to the persons engaged in the games, than with respect either to the games themselves, or the persons suffering them to be played in their houses. The keepers of games, or tables, or banks, exhibited for the purpose of alluring others to bet against them, have always been severely dealt with, and sometimes subjected to degrading punishment—while those who have been engaged in betting against them, or in betting against each other, at games common to all the players, have been subjected, in our modern legislation, to no other legal penalty but the forfeiture of their bets or their winnings. But this does not prove that the latter species of games are lawful when made the occasion of betting. And that there is, in contemplation of law, and in the view of the Legislature, no distinction in point of legality—though there may be in the degree of offensiveness—between the several classes of games themselves, is particularly manifested by the several enactments against those who suffer them to be played in their houses.
The act of 1779, (1 Stat. Law, 751,) subjects any tavern-keeper, who shall permit cards, dice, billiards, or any instrument of gaming, to be made use of in his house, &c. to the loss of his license, and, moreover, to a penalty of one hundred pounds. The same act subjects any person losing or winning more than five pounds in twenty four hours, to severe penalties.
The statute of 1799, (1 Stat. Law, 754,) in its second section, enacts, that any person who shall suffer any of the games of A. B. C., faro bank, or E. O. tables, or any other game whatever, at which any money or property is won or lost, to be played in his or her house, &c. shall forfeit one hundred dollars for each offence.
The act of 1823, (1 Stat. Law, 757,) denounces a penalty of two hundred and fifty dollars against any person who shall suffer any gaming table, (except a billiard table,) or bank, at or on which any game of chance whatever *507 shall be played for money, or any other thing, to be set up or kept in his house, &c., and, if he be a tavern-keeper, declares, that “he shall forfeit his license, and shall never be licensed again, and fined double.”
In the enactment of this increased penalty the Legislature either again places all species of games at which money is bet, on the same footing, so far as relates to the person suffering them to be played in his house, or if, as seems probable, on reference to the first section of the act, the penalty applies only to the permission of such games or banks as may be said to be set up or kept for the allurement of betters, it is the first to make a distinction on this point, and, at least, does not repeal the previous act, so far as it inflicts the penalty of one hundred dollars for permitting any other game whatever, at which money or property is won or lost. And so stood the law until the act of 1833 was passed.
It is entirely certain, then, that previous to, and at the date of, the act of 1833, it was an unlawful act, and indeed a highly penal offence, for any person to permit any game for money or property to be played in his house; and it had been so, during the whole previous existence of this Commonwealth. There seems to be no impropriety in denominating that as itself unlawful, the permission of which was unlawful. And it might well be asked why so great an effort, and so many and such heavy penalties for the suppression of gaming for money in every shape, if gaming for money in any shape were considered innocent or lawful, or not unlawful ?
But again: the act of 1833 was evidently intended to increase the penalties for the suppression of every species of gaming for money, and to facilitate their recovery. The section under consideration, is, according to our construction of it, in perfect accordance with this general object of the statute. If, as we suppose, it applies to the permission of any game at which money is won and lost, its minimum penalty of two hundred dollars, is double the previous penalty for the permission of ordinary games, which have never been designated by name in any of the statutes, while its maximum of five hundred dollars, is double the previous penalty for the *508 permitting of banks and gaming tables, at which money is won and lost, to be set up or kept—the application of the penalty in its different degrees being left to the discretion of the jury. But upon the opposite construction, the previous penalty of one hundred dollars for permitting ordinary games, would be left without increase. This might, or might not, be an objection to the law itself, if it were so; but it is inconsistent with its general object and intention, and is therefore inadmissible, unless it be the clear and obvious meaning of this particular clause. It is true, that, upon the construction which we have adopted, no positive effect is given to the word ‘unlawful’ as qualifying the word ‘game or games;’ but this criterion is entitled to little weight among the graver considerations which belong to the question, and which, in our opinion, show that any game at which money or property is won or lost, is, in fact, unlawful, may well be so denominated, and was so considered by the Legislature which enacted this law. There was, therefore, no error in the instruction given, nor in the other opinions of the Court, based upon the same construction of the statute in question.
The act of 1836, altering the mode of summoning juries, does not, in terms, apply to the city court of Louisville; but a jury having been summoned for that court, in the mode prescribed by that act, is no cause for challenge to the array.
The right of challenging jurors, for cause, or peremptorily, and of seeing the persons from whom the triers are to being impaired—and it will not construction of the act—the party to be tried cannot object to the manner of summoning the jury.
*508 Second. In summoning and selecting the jury, the mode prescribed by the act of 1836, altering the mode of summoning jurors was pursued, notwithstanding the objections of the plaintiff in error, who challenged the array as improperly summoned, and refused to co-operate the selection of the jury, on the same around. Exceptions were taken to the opinions of the Court over-ruling his objections, and his challenge, and these opinions are now presented for our revision. It is sufficient, however, to remark that, although the statute of 1836, is not in terms applicable to the City Court of Louisville yet we do not see how, if there be, as there was in this case, no objection to the officer summoning the jury, the mere manner or time of giving the jurors notice, and of getting them into Court, can furnish ground for challenging the array, or can prejudice the rights of the party in any respect, if his right of challenge, peremptory and for cause, and of seeing the persons from *509 whom he is to select his triers, is not taken away or impaired by the proceeding which the statute directs.
A motion for leave to introduce a witness after the examination of witnesses has been closed, is addressed to the sound discretion of the court: when the fact to be proved is not disclosed, and no excuse shown for not having introduced the witness before, his exclusion was proper. The opinion of counsel that the testimony was material, if it would justify, would not give a right to demand, its admission.
And it is not shown, nor do we perceive, that this right has been injuriously affected by the mode adopted in this case, nor that it should be under a proper construction of the act. The party’s right to the ancient mode of trial by jury, has not been infringed, so far as appears; and he has shown no sufficient ground for his general objections to the mode of making up the jury.
Third. The offer on the part of the plaintiff in error, to introduce a witness, after the general evidence was closed, and the attorney for the commonwealth had finished his opening speech, was addressed to the sound discretion of the Court. And as the fact intended or expected to be proved, was not made known, nor any excuse offered for not having proved it before, there could have been no abuse of discretion in refusing the application. The mere circumstance that it had not been proved before, and that it was deemed material by the counsel, if it would have justified the proposed departure from the ordinary mode of proceeding in the trial, did not give the party a right to demand it, and is by no means sufficient to satisfy this Court, that it was erroneous to refuse it.
Wherefore, there being no error in the record prejudicial to the plaintiff in error, the judgment is affirmed.